## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PHILADELPHIA 76ERS L.P., | : Civil Action No. 04-CV-4972 |
| Plaintiff, | : |
| v. | : |
| TRUSTMARK INSURANCE COMPANY, and NEW JERSEY NETS BASKETBALL LLC, | : |
| Defendants. | : |

## ORDER

AND NOW, this        day of December, 2004, upon consideration of the Motion of Defendant Trustmark Insurance Company's Motion to Dismiss or Transfer Venue and Motion for an Emergency Stay of Plaintiff's Pending Motion to Compel Arbitration and Plaintiff's response thereto, it is hereby ORDERED that the Motions are DENIED.

_____
Hon. Edmond V. Ludwig, USDJ

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PHILADELPHIA 76ERS L.P., | : | Civil Action No.  04-CV-4972 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **MOTION TO COMPEL** |
| TRUST MARK INSURANCE COMPANY, and | : | **ARBITRATION** |
| NEW JERSEY NETS BASKETBALL LLC, | : | (9 U.S.C. § 4) |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF LAW OF PLAINTIFF PHILADELPHIA 76ERS L.P.
IN OPPOSITION TO DEFENDANT TRUST MARK INSURANCE
COMPANY'S MOTION TO DISMISS OR TRANSFER VENUE AND
MOTION FOR AN EMERGENCY STAY OF PLAINTIFF'S PENDING
<u>MOTION TO COMPEL ARBITRATION</u>**

<u>PRELIMINARY STATEMENT</u>

By way of the pending Motion to Dismiss or Transfer Venue and Emergency Motion to

Stay the Pending Motion of plaintiff Philadelphia 76ers L.P. (the "76ers") to Compel Arbitration,

defendant, Trustmark Insurance Company ("Trustmark"), contends that this action between

Philadelphia's professional basketball team and an Illinois insurance carrier licensed in

Pennsylvania to compel arbitration under an insurance certificate issued to the New Jersey Nets

may proceed only in the United States District Court for the Southern District of New York.

These Motions are nothing more than a continuation of the disturbing pattern of procedural

gamesmanship and delay tactics that forced the 76ers to seek judicial intervention in the first

place.  They are also based upon Trustmark's troubling mischaracterizations of the scope of the

forum selection clause set forth in the arbitration clause of the policy at issue and of the

proceedings in the arbitration the 76ers commenced.

Trustmark argues that, as this Court cannot order arbitration to occur outside of the Eastern District, it lacks authority to grant relief to the 76ers without violating a forum selection clause in the parties' arbitration agreement. According to Trustmark, that agreement provides that the arbitration shall be held in the offices of the American Arbitration Association ("AAA") in New York City unless Trustmark agrees otherwise. In fact, the parties' arbitration agreement provides for the arbitration to be held "in a location agreed to by the parties" and selects the AAA's offices as the place of the arbitration only if the parties cannot agree. As confirmed in correspondence from the AAA (Exhibit "A" hereto), the parties agreed during the course of the arbitration proceedings the Sixers commenced that the location of the arbitration would be determined after the panel was appointed.

While an arbitration panel has been appointed, an administrative hearing has not yet been scheduled and therefore no place for the arbitration has been selected. Accordingly, to leave venue in this Court would not displace any agreement among the parties. The 76ers are entitled to proceed in any district which would otherwise have venue, and Trustmark should not be heard to complain about the 76ers' selection of a District most convenient to it. Not only is the plaintiff's choice of forum entitled to substantial deference, it was Trustmark's refusal to honor its commitment to arbitrate that necessitated the filing of this action.

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

For several years, Trustmark has served as the administrator and insurer of the National Basketball Association's ("NBA") Temporary Total Disability ("TTD") program. Trustmark and the NBA executed a Master Policy which sets forth the general terms under which Trustmark will participate in the TTD program. Trustmark also issued certificates of insurance to NBA teams for each insured player.

Prior to the 2002-2003 NBA season, the 76ers acquired Todd MacCulloch's services in a trade with the New Jersey Nets. At the time of the trade, Mr. MacCulloch was covered under a Certificate of Insurance Trustmark issued to the Nets pursuant to the Master Policy. The Nets assigned this Certificate to the 76ers utilizing a form of assignment that was expressly negotiated between the NBA and Trustmark. The Assignment specifically provides that "[a]ny defenses, counterclaims or offset rights the Insurer may have against the Assignor are waived as against the Assignee." The NBA obtained this waiver in order to facilitate trades by allowing Clubs to acquire players without incurring the risk of being forced to carry a player's salary should he become disabled and the carrier disclaim coverage based upon the conduct of the player or the Club trading him.

In 2003, Mr. MacCulloch was diagnosed with Charcot-Marie-Tooth disease ("CMT"), a hereditary disease that causes the nerves in a patient's extremities to deteriorate resulting in numbness and a loss of strength in the arms and legs. It cannot reasonably be disputed that this disease has totally disabled Mr. MacCulloch from playing professional basketball. The 76ers accordingly submitted a claim to Trustmark under the TTD Certificate of Insurance for Mr. MacCulloch. Without ever interviewing Mr. MacCulloch, his treating physicians or anyone from the Nets or 76ers, Trustmark denied the 76ers' claim based on the assertion that the Nets and MacCulloch made material misrepresentations and omissions in the policy application by failing to disclose that Mr. MacCulloch suffered from a minor case of plantar fasciitis, a transitory and relatively common injury among professional basketball players.

Accordingly, the 76ers filed a Demand for Arbitration with the American Arbitration Association ("AAA"). The 76ers' Demand for Arbitration was submitted in accordance with the terms of the Certificate of Insurance covering Mr. MacCulloch which provides that any disputes

under the Policy be arbitrated. (A copy of the Certificate of Insurance is attached hereto and

marked Exhibit "B.") Of significance here, the arbitration clause states in part as follows:

> Each party to the arbitration shall select one arbitrator. A third
> independent arbitrator shall be selected by the first two arbitrators.
> Arbitration shall be held in a location agreed to by the parties. If
> no location can be agreed upon, arbitration shall be held at the then
> current main corporate office of the American Arbitration
> Association. If the American Arbitration Association is not in
> existence or its offices unavailable, arbitration shall be held at Our
> home office.

In the Demand for Arbitration, the 76ers asserted that under the Master Policy and Assignment,

Trustmark could not assert defenses or counterclaims against it based upon the acts or omissions

of the Nets or MacCulloch and that, in any event, there were no misstatements or omissions in

the policy application.

The 76ers' Arbitration Demand initially proceeded in accordance with the arbitration

agreement and the AAA's Rules. Of significance here, the parties participated in an initial

administrative conference call with the AAA's supervising case manager on October 8, 2004 in

which they agreed that the location of the arbitration would be selected after a complete panel

was appointed. (Exhibit "A" hereto) However, as is set forth in detail in the 76ers Motion to

Compel Arbitration, Trustmark thereafter filed a separate Demand for Arbitration against the

76ers and Nets seeking to rescind the Certificate of Insurance covering MacCulloch and,

alternatively, demanding indemnity or contribution from the Nets for any amounts it may be

required to pay the 76ers. Trustmark also purported to file a Third-Party Demand for Arbitration

against the Nets in the arbitration the 76ers commenced in which it raised the identical claims

against the Nets that it purported to assert in its separate Arbitration Demand. In support of these

demands for relief, Trustmark alleged that it was induced to provide coverage to Mr.

MacCulloch without any disclaimers by misrepresentations and material omissions in the policy

application the Nets and MacCulloch submitted. Trustmark also claimed that the 76ers were

somehow responsible for the Nets' alleged misrepresentations and omissions and attempted to assert causes of action against it for rescission of the Certificate of Insurance, negligent misrepresentation and fraudulent inducement.

Both the Nets and the 76ers objected to Trustmark's separate Demand for Arbitration on the grounds that there was no basis to join them in one proceeding. The 76ers also objected to Trustmark's Demand for Arbitration on the grounds that its claims against the 76ers were really (meritless) defenses to the claims the 76ers had already asserted in its Demand for Arbitration. For its part, the Nets objected to the Third-Party Demand in the arbitration proceedings the 76ers commenced on the additional grounds that the AAA's rules do not authorize third-party proceedings.

The 76ers made numerous good faith attempts to resolve the procedural morass Trustmark had created, but Trustmark insisted that all claims be resolved in one complex proceeding. At the same time, however, the NBA requested that Trustmark agree to its intervention in the 76ers' arbitration so that it may be heard on the issue of whether Trustmark was barred from denying an assignee Club's claim based upon the actions of an assigning Club or player. The NBA sought to intervene because Trustmark's attempt to assert defenses against the 76ers based upon alleged inaccuracies in the policy application would impact other NBA Clubs by impeding the ability to trade players. After extolling the purported virtues of consolidated proceedings, Trustmark rejected the NBA's request.

Under the circumstances, the 76ers had no alternative but to seek judicial intervention to break the Gordian knot Trustmark had tied. The 76ers filed a Complaint and Motion to Compel Arbitration under Section 4 of the FAA in this Court seeking expeditious relief to compel Trustmark to arbitrate the 76ers' claim in accordance with the parties' agreement. As a general matter, the 76ers seek to consolidate its arbitration with the arbitration the NBA commenced, to

require the threshold issue of whether Trustmark can deny coverage to the 76ers based on purported inaccuracies in the policy application to be resolved first and, thereafter, to resolve any remaining issues between the 76ers and Trustmark or Trustmark and the Nets.

Even after the 76ers sought relief in this Court, Trustmark continued its procedural gamesmanship. After requiring the 76ers to incur the costs of responding to its independent Arbitration Demand, Trustmark dismissed it from that proceeding. Then, several weeks later when the NBA pursued its own Arbitration Demand, Trustmark filed a purported Third-Party Demand for Arbitration against the Nets and the 76ers raising the same allegations and asserting the very same claims that were presented in Trustmark's separate Arbitration Demand. Trustmark's gamesmanship has now extended to the instant proceedings with its filing of the presently pending Motion to Dismiss or Transfer Venue and for an Emergency Stay of the 76ers' Motion to Compel Arbitration. Moving solely under 28 U.S.C. § 1406, Trustmark claims that this Court must dismiss or transfer because venue is improper in this District. Trustmark furthermore claims that there is no deadline for it to respond to the Motion to Compel Arbitration because it was only served on Cleary, Gottlieb, Steen & Hamilton at a time when that firm had not entered its appearance for Trustmark. It takes this position despite the fact that Cleary, Gottlieb appears as counsel to Trustmark on the Motion to Dismiss or Transfer Venue and for an Emergency Stay.

## ARGUMENT

### A.    Trustmark's Motion to Dismiss or To Transfer Venue Is Meritless

In moving to dismiss or transfer venue under 28 U.S.C. § 1406, Trustmark seeks relief under a section of Title 28 that could not possibly apply here and confuses a motion to dismiss or transfer for improper venue under Section 1406 with a motion to transfer for the convenience of the parties and the Court under Section 1404(a). The Court should deny Trustmark's Motion

on the grounds that venue is proper in this District, particularly in that there is no express forum

selection clause which would justify transferring this action under Section 1404(a).

1.   **There Is No Basis To Dismiss or Transfer This Action Under Section
1406 Where Venue Is Proper in This District**

Section 1406 of Title 28 provides that:

> The district court of a district in which is filed a case lying venue
> in the wrong division or district shall dismiss, or if it be in the
> interest of justice, transfer such case to any district or division in
> which it could have been brought.

28 U.S.C. § 1406(a).  In accordance with its express language, it is well-settled an action may be

dismissed or transferred pursuant to this Section only if it was filed in a district in which there is

no statutory grant of venue, such that the action could never have been filed in that district.

*Jumara v. State Farm Insurance Co.*, 55 F.3d 873, 878-79 (3d Cir. 1995).  In the instant action,

dismissal or transfer under Section 1406 is inappropriate because venue is proper in the Eastern

District of Pennsylvania  under the FAA and Title 28's general venue provisions.

Section 4 of the FAA provides, in relevant part, that:

> A party aggrieved by the alleged failure, neglect, or refusal of
> another to arbitrate under a written agreement for arbitration may
> petition any United States district court which save for such
> agreement, would have jurisdiction under title 28, in a civil action .
> . . for an order directing that such arbitration proceed in the manner
> provided for in such agreement . . . [T]he court shall make an order
> directing the parties to proceed to arbitration in accordance with
> the terms of the agreement.  The hearing and proceedings, under
> such agreement, shall be within the district in which the petition
> for the order directing such arbitration is filed.

9 U.S.C. § 4.  Contrary to Trustmark's arguments, to the extent Section 4 of the FAA contains a

specific venue provision, it is set forth in its first sentence which authorizes an aggrieved party to

seek relief in any district in which there would otherwise be jurisdiction.

These proceedings were properly filed in this Court because the 76ers could have

commenced an action in this District to recover the amounts owing under the Certificate of

Insurance but for the arbitration agreement.  There is diversity of citizenship and the amount in controversy exceeds $75,000 (Complaint, ¶¶ 1-3).  Moreover, Trustmark is licensed in Pennsylvania (*see*, printout from Pennsylvania Department of Insurance's website, which is attached hereto and marked Exhibit "C").  It is therefore subject to personal jurisdiction in this Commonwealth and venue is properly laid in this District.  *See*, 28 U.S.C. § 1391(c) ("For purposes of venue under this chapter a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced").

Accordingly, Trustmark's argument that this Court nevertheless cannot resolve this action because Section 4 of the FAA prohibits it from ordering arbitration to take place in New York City as required by the parties' forum selection clause does not raise a proper objection under Section 1406(a).  While it appears a few courts have mistakenly relied on Section 1406(a) in dismissing or transferring an action to compel arbitration where the arbitration clause designated a forum for the proceedings outside the district in which relief was sought, they have not ruled that venue was improper in the court in which the matter was filed.  Rather, the great weight of decisions have held that the court should refrain from exercising the jurisdiction conferred upon it because it could not order the parties to proceed to arbitration as specified in their forum selection clause.  *Econo-Car International, Inc. v. Antilles Car Rentals, Inc.*, 499 F.2d 1391 (3d Cir. 1974) (vacating district court's order compelling arbitration in the Virgin Islands where forum selection clause specified New York as the place of the arbitration and court could not order arbitration to proceed outside of its district).  For instance, in *Snyder v. Smith*, 736 F.2d 409 (7th Cir. 1984), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998), the court found that it "must give effect to such freely-negotiated forum selection clauses," 736 F.2d at 419, and reasoned that:

> Under the statute, a district court has no power to order
> arbitration to take place outside of its own district.  Yet, under the
> statute, the court must order the parties to arbitrate "in accordance
> with the terms of the agreement"; one term of the agreement is the
> parties' forum selection clause.

*Id.*, at 418 (citations and footnote omitted).  Moreover, the court recognized that it would be

appropriate to retain jurisdiction if there were "compelling or counter veiling" reasons not to

enforce the forum selection clause.  *Id.*, at 419.

As such, the only appropriate remedy for a party claiming that the court in which the

action was filed cannot order arbitration to take place in the location selected in an enforceable

forum selection clause is to seek a transfer of venue under 28 U.S.C. § 1404(a).  Section 1404(a)

permits a court to transfer an action over which it would otherwise have venue "[f]or the

convenience of the parties and witnesses, [and] in the interest of justice . . ." 28 U.S.C. §

1404(a).  This is precisely the analysis that the Third Circuit applied under the Uniform

Arbitration Act as enacted in Pennsylvania in *Jumara v. State Farm Insurance Co.*, 55 F.3d 873

(3d Cir. 1995), and is equally applicable here.

In *Jumara*, the defendant insurance carrier objected to an action commenced in this Court

to compel arbitration on the grounds that the parties' agreement provided that the arbitration

must occur in Luzerne County.  The Third Circuit held that:

> Although the district court in effect disposed of the case under 28
> U.S.C. § 1406 (for improper venue), we conclude that, because venue was
> actually proper in the Eastern District of Pennsylvania, the case could not
> be dismissed pursuant to that provision.  The district court should instead
> have invoked 28 U.S.C.  § 1404(a), which involves a multi-factor
> balancing test in which a contractual forum selection clause carries
> substantial although not dispositive weight.  However, because the other
> factors cannot even in combination overcome the forum selection clause,
> we will not remand the case, but rather will direct the district court to
> transfer the case to the United States District Court for the Middle District
> of Pennsylvania, a "court of record" in Luzerne County.

*Id.*, at 875 (footnote omitted).

Section 1404(a) is also the proper vehicle in a litigation on the merits (as opposed to an action to compel arbitration) for a defendant to challenge a plaintiff's choice of venue as inconsistent with a forum selection clause.[1] *Applied Card Systems, Inc. v. Winthrop Resources Corp.*, No. 03-4104, 2003 U.S. Dist. LEXIS 18150 * 2 (E.D.Pa. September 23, 2003) (in transferring venue based on forum selection clause, court found that "§ 1404(a) is the appropriate statutory provision for transfer of an action when jurisdiction is proper in both the original and the requested forum"); *Siegel v. Homestore, Inc.*, 255 F.Supp. 2d 451, 456 (E.D.Pa. 2003). There is no reason that the impact of a contractual agreement as to the place of an arbitration should be analyzed differently.

As Trustmark has moved to dismiss or transfer only under Section 1406, it is respectfully submitted that it would be appropriate for the Court to deny this Motion without further consideration. Trustmark's assertion that venue is improper in this District is legally and factually wrong and it has not even relied upon Section 1404(a), let alone attempted to demonstrate that venue should be transferred to the Southern District of New York for the convenience of the parties where they have little, if any, relationship to New York City. Should the Court nevertheless determine to analyze whether transfer would be appropriate under Section 1404(a), Trustmark cannot establish any reasonable basis to deny the 76ers its choice of forum.

## 2. There Is No Basis to Disturb the 76ers' Choice of Forum

Unlike every case upon which Trustmark relies, there is no a forum selection clause in this action specifically selecting a place for the arbitration outside of this District to outweigh the substantial deference to which the 76ers' choice of forum is entitled. *Shutte v. ARMCO Steel*

---

[1] It is recognized that, in *Econo-Car International, Inc. v. Antilles Car Rentals, Inc., supra*, the Court simply dismissed the case, rather than transferring venue. However, the case reached the Third Circuit only after the proceedings on the merits had been completed and no party requested a transfer of venue. Moreover, *Jumara* should be followed as it represents the Third Circuit's most recent pronouncement on this issue and is consistent with the analysis typically employed where parties seek to enforce contractual forum selection clauses.

*Corp.*, 431 F.2d 22, 24 (3d Cir. 1970) (plaintiff's choice of a proper forum demands "paramount consideration"); *Mountbatten Surety Co., Inc. v. Accordia of Kentucky, Inc.*, No. 99-3052, 2000 U.S. Dist. LEXIS 333 * 8 (E.D.Pa. January 18, 2000) (court's discretion to transfer venue "is to be exercised in light of the strong presumption in favor of the plaintiff's choice of forum"). As is set forth previously, the Master Policy states that the "[a]rbitration shall be held in a location agreed to by the parties." The AAA's corporate office is only designated as a default location in the event the parties cannot amicably select a site of the hearing. There is no agreement on a specific place for the arbitration that the Court should enforce at the expense of the 76ers' right to choose the forum in which to commence its action.

As Trustmark has contended in other proceedings, the Master Policy imposes an obligation to negotiate and select an appropriate location for the arbitration in good faith. *Trustmark Ins. Co. v. Fire & Casualty Ins. Co. of Connecticut*, No. 02 C 0934, 2002 U.S. Dist. LEXIS 7923, * 2 (N.D. Ill. May 1, 2002). As the Master Policy addresses the selection of the location for the arbitration after establishing the procedure for selecting the arbitrators, it contemplates that the place for the arbitration will be selected in consultation with the arbitrators. It cannot seriously be disputed that this is how the parties intended to proceed given that the Supervising Case Manager for the AAA memorialized their agreement at the initial administrative conference in the 76ers' arbitration to select the arbitration location after the panel was appointed. (*See*, Exhibit "A" hereto)

While Trustmark may argue that it would be deprived of the opportunity to negotiate an acceptable forum if it is compelled to arbitrate in this District, this is the inevitable result of its choice of procedural gamesmanship over complying with the terms of the Master Policy and the FAA's requirement that courts compel arbitration to occur in the district in which they sit. To reach the stage at which the parties would select an arbitration location, the 76ers were required

11

to obtain Court intervention because of Trustmark's obstinate refusal to comply with its obligations under the agreement. The 76ers had to pick one district in which to proceed and, as the plaintiff, its choice of forum is entitled to substantial deference. *Shutte v. ARMCO Steel Corp., supra; Mountbatten Surety Co., Inc. v. Accordia of Kentucky, Inc., supra.* The 76ers also had the same right under the Master Policy as Trustmark to negotiate an acceptable forum for the arbitration. The 76ers should not be required to forego this right and to proceed in a venue not of its choosing in order to obtain relief from Trustmark's failure to comply with the arbitration provisions of the Master Policy. In this respect, it is noted that Trustmark will only be required to arbitrate in this District pursuant to an Order of this Court if relief is granted to the 76ers, which will only occur if it is determined that Trustmark breached its obligation to arbitrate this dispute. Where one of the parties must be deprived of a right under an agreement, it should certainly be the breaching, and not the injured, party who bears this burden.

**B.    Trustmark's Request to Stay the 76ers' Motion to Compel Arbitration Must Also Fail**

As Trustmark's Motion to Stay its obligation to respond to the 76ers' Motion to Compel Arbitration is ancillary to its Motion to Dismiss or Transfer Venue, that Motion should be denied on the same grounds as the Motion to Dismiss or Transfer Venue. Trustmark's assertion that the time within which it must respond to the Motion to Compel Arbitration has not begun to run because the Motion was only served on its counsel is frivolous in that Clearly, Gottlieb appears as counsel on the pleadings and Federal Rule of Civil Procedure 5 permits the service of all pleadings subsequent to the Complaint upon counsel.

12

EXHIBIT A

American Arbitration Association
*Dispute Resolution Services Worldwide*

Catherine Shanks
Vice President

Christopher Fracassa, Yvonne Nelson
Assistant Vice Presidents
950 Warren Avenue, East Providence, RI 02914
telephone: 866-293-4053 facsimile: 401-435-6529
internet: http://www.adr.org/

October 8, 2004

**VIA FACSIMILE**
Stephen A. Cozen, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Jeffrey A. Rosenthal
Cleary Gottlieb Steen & Hamilton
1 Liberty Plaza
New York, NY 10006

Re: 14 195 Y 01711 04
    Philadelphia 76ers, L.P.
    and
    Trust Mark Insurance Company

Dear Counsel:

This will acknowledge receipt of Respondent's Answer from Mr. Rosenthal, a copy of which we note was exchanged with Mr. Cozen.

This will confirm a conference call with Mr. Cozen, Mr. Hayes, Mr. Rosenthal, Mr. Mathews, and the undersigned was held on October 7, 2004 and the following items were discussed:

- At this time the parties are not in agreement to consolidate this matter with the Demand filed by Trust Mark Insurance against Philadelphia 76ers and New Jersey Nets Basketball.

- The parties agreed that the locale of the hearing in the above referenced matter will be determined after the panel has been appointed.

- The Association has received the checklist for conflicts from both parties.

- This will confirm the parties have agreed the party appointed arbitrators shall be non-neutral. We ask the parties to confirm this agreement in writing on or before **October 18, 2004**. Absent written agreement, the party appointed arbitrators shall serve as neutral arbitrators and be subject to impartiality standards in accordance with the Rules.

- Please be advised the Association does not collect deposits for party appointed arbitrators. The parties have agreed that in accordance with their agreement, the costs of the arbitration will be borne equally <u>except</u> each party shall be responsible for its own party appointed arbitrator's compensation and expenses in full.

- In accordance with the parties' agreement, the party appointed arbitrators will select the third neutral arbitrator. The party appointed arbitrators shall advise the Association of

their selection on or before <u>October 25, 2004</u>. The parties have agreed that if the party appointed arbitrators are unable to agree upon the third arbitrator, the parties will agree to a process for selection of the third arbitrator.

Upon appointment of the third arbitrator a preliminary hearing will be set.

The Association will require advance deposits for the neutral arbitrator once the arbitrator has been appointed. These deposits are calculated on the number of days the parties have suggested will be necessary, in addition to the pre and post hearing time that the arbitrator may charge pursuant to the arbitrator's resume.

The Association will make maximum use of fax machines when communicating in writing, and request that the parties do the same.

We request the parties not send copies of documents being exchanged between the parties to the Association, such as discovery, unless they are being referred to the arbitrator for a determination. These documents will be returned to you if we receive them.

If you need to extend any deadline during the course of these proceedings, please try to obtain the other party's agreement prior to contacting the Association. Untimely filings will not be considered by the Association.

This case will be administered by facilitating the exchange of appropriate written documents through the Association. To ensure the proper handling of all case-related documents, the parties are asked not to submit correspondence directly to the arbitrator. Correspondence should be submitted to the undersigned for transmittal to the arbitrator, copying the other party.

For your convenience, you may charge the administrative fee and deposit for arbitrator fees and expenses to your credit card. If you desire to do so, please complete the enclosed charge authorization and return it to us.

Mediation is available to the parties throughout the process of the arbitration. In addition to local mediators, the Association has a select group of mediators that serve on the Association's President's Panel of Mediators. Having already filed for arbitration, there is no additional administrative fee for this service. The compensation of the mediator will be based on the number of hours reported by the mediator. If at any point you would like to mediate please contact the undersigned.

Please do not hesitate to contact the undersigned should you have a question.

Sincerely,

Linda L. Beyea
Supervisor
401 431 4725
Beyeal@adr.org

Encl.

# EXHIBIT B

**TRUSTMARK INSURANCE COMPANY**
**400 Field Drive**
**Lake Forest, Illinois 60045**
**(847) 615-1500**
**("We, Us and Our")**

This is the Certificate of Insurance ("Certificate") while the Master Policy ("Policy") is in force. It explains the rights and benefits that are determined by the Policy. The Policy is a contract between the Policyholder and Us. The Policyholder is the National Basketball Association Trust.

The Policy, together with the Certificate attached thereto and any amendments or riders thereto, constitutes the agreement under which benefit payments are made. We will pay the benefits set forth in the Policy. Benefit payment is governed by all of the terms, exclusions, limitations and conditions of the Policy. The Policy may be amended by written agreement between the NBA and Us without the consent of or notice to the Club, any Insured Player or beneficiary. Any such amendment will not affect any benefit due before the amendment takes effect.

The Policy is administered by BWD Group LLC ("BWD"), Sports, Entertainment & Special Risks Group, BWD Plaza, P.O. Box 9050, Jericho, New York, 11753-8950. A copy of the Policy is kept at BWD. It may be inspected by any Club, Insured Player or beneficiary during normal business hours. We reserve the right to delegate such duties and responsibilities of Ours to BWD, as administrator, as agreed upon by the NBA, BWD and Us.

This Certificate automatically supersedes any other Certificate We have previously issued to the Club or any Insured Player.

**Please read this Certificate carefully.**

**TRUSTMARK INSURANCE COMPANY**

J. Grover Thomas, Jr.
President & Chief Executive Officer

Frank G. Gramm
Corporate Secretary

G446-23

-2-

## SCHEDULE

| | |
|---|---|
| **POLICY NUMBER:** | NBA 01 |
| **CERTIFICATE NUMBER:** | 1001-1664 |
| **SCHEDULE DATE:** | March 19, 2002 |
| **CLUB:** | New Jersey Nets |
| **BENEFICIARY:** | New Jersey Nets |
| **INSURED PLAYER:** | Todd MacCulloch |
| **COVERAGE EFFECTIVE DATE:** | 12:01 a.m. September 4, 2001 |
| **COVERAGE PERIOD:** | From: 12:01 a.m. September 4, 2001<br>To:    12:01 a.m. May 1, 2007 |
| **ELIMINATION PERIOD:** | 41 Regular Season Games |

**COVERED SALARY*:**

| For Policy Year Beginning: | Covered Salary is: | Per Game Benefit is: |
|---|---|---|
| September 4, 2001 | $4,538,000.00 | $44,273.17 |
| September 1, 2002 | $4,991,800.00 | $48,700.49 |
| September 1, 2003 | $5,445,600.00 | $53,127.80 |
| September 1, 2004 | $5,899,400.00 | $57,555.12 |
| September 1, 2005 | $6,353,200.00 | $61,982.44 |
| September 1, 2006 | $6,807,000.00 | $66,409.76 |

**CONTRIBUTION DUE*:**

| For Policy Year Beginning: | Contribution is: |
|---|---|
| September 4, 2001 | $230,247.60 (includes $53,265.60 surcharge for 2006/07 coverage) |
| September 1, 2002 | $194,680.20 |
| September 1, 2003 | $212,378.40 |
| September 1, 2004 | $230,076.60 |
| September 1, 2005 | $247,774.80 |
| September 1, 2006 | $ 79,641.90** |

* Covered Salary, Per Game Benefit and Contributions are subject to adjustment pursuant to the terms and conditions of the Policy.  Contributions after the Policy Year of Issue are subject to adjustment by Us.  This Schedule replaces any previously dated Schedule.

** The Contribution for the final season of coverage reflects a 70% discount, which will not apply if coverage is cancelled or a claim is pending in the final season, or if coverage is extended to include future seasons.

## TABLE OF CONTENTS

Begins on Page

**Schedule of Benefits**                                     2

**Definitions**                                              4
   Club
   Coverage Period
   Covered Salary
   Elimination Period
   Employment Contract
   Injury
   Insured Player
   Maximum Benefit Period
   NBA
   Period of Disability
   Physician
   Player
   Policy Year
   Presumptive Disability\Presumptively Disabled
   Regular Season Game(s)
   Salary
   Sickness
   Temporary Total Disability\Temporarily Totally Disabled

**Benefit Provisions**                                       6
   Temporary Total Disability Benefits
   Elimination Period
   Recurrent Disability
   Concurrent Disability
   Rehabilitation Benefits
   Benefit Commutation
   Salary Commutation

**Exclusions, Limitations and Termination**                  8
   Exclusions
   Limitations
   Termination

**Claim Provisions**                                         9
   Notice of Injury or Sickness
   Notice of Claim; Claim Forms; Proof of Disability

Payment of Claims; Assignment
Application Statements
Payment Error
Fraudulent Claim Submission
Medical Records and Examination
Claim Appeal
Legal Actions
Arbitration

### DEFINITIONS

**Club:** One of the current 29 professional basketball teams in the National Basketball Association or an expansion team added to the National Basketball Association while the Policy is in force.

**Coverage Period:** The period of time during which an Insured Player is covered for Temporary Total Disability as shown on the Schedule.

**Covered Salary:** The Salary which the Company has approved for coverage, as shown on the Schedule.

**Elimination Period:** The number of Regular Season Games that an Insured Player must miss during a Period of Disability before any benefits are payable. The Elimination Period is shown on the Schedule.

**Employment Contract:** A binding contract of employment between a Club and an individual which: (a) requires the individual to perform the duties of a professional basketball player in the National Basketball Association; and (b) includes guaranteed compensation during Temporary Total Disability.

**Injury:** Accidental bodily damage sustained by an Insured Player during the Coverage Period which is not specifically excluded from coverage.

**Insured Player:** A Player: (a) who has an Employment Contract with a Club; (b) on whose behalf the Club has made application for Temporary Total Disability coverage which is approved by Us; and (c) whose coverage is in force under this Certificate.

**Maximum Benefit Period:** At any point in time, the number of Regular Season Games which remain for the Club during the Insured Player's Coverage Period, subject to the Elimination Period.

**NBA:** National Basketball Association.

G448-23                                    4

**Period of Disability:** The period of time during which an Insured Player has a Temporary Total Disability resulting from a single cause or related causes.

**Physician:** A licensed medical doctor, surgeon or dentist practicing within the scope of such license other than: (a) any Club owner or employee, except the designated team Physician; (b) any Player's spouse; or (c) the parent, grandparent, child or sibling of any Player or Player's spouse.

**Player:** An individual who plays professional basketball for a Club.

**Policy Year:** The 12-month period beginning on the Effective Date of the Policy and each Policy anniversary date thereafter. The first Policy Year for an Insured Player shall begin on his Coverage Effective Date and end on the immediately subsequent Policy anniversary date.

**Presumptive Disability\Presumptively Disabled:** Any of the following conditions when certified as total, permanent and irrecoverable by a Physician:

1.    Loss of sight in both eyes;
2.    Loss of the use of one hand or one foot;
3.    Quadriplegia; or
4.    Paraplegia.

**Regular Season Game(s):** All games during a Policy Year designated by the NBA as regular season play for the Club.

**Salary:** A Player's current and deferred compensation which is guaranteed under his Employment Contract for Injury and/or Sickness. Additional guaranteed compensation, including but not limited to a signing bonus, may be amortized and included in Covered Salary with Our prior approval. Compensation that is not guaranteed, including but not limited to a performance bonus, is excluded from Covered Salary. Any compensation which becomes guaranteed when earned may then be included in Covered Salary in the season in which it is paid with Our prior written approval.

**Sickness:** Illness or disease sustained by an Insured Player during the Coverage Period which is not specifically excluded from coverage.

**Temporary Total Disability\Temporarily Totally Disabled:** The inability of an Insured Player to perform the duties of a professional basketball player in the NBA which:

1.    Is due to Injury or Sickness; and
2.    Is certified by a Physician.

G446-23                                   5

## BENEFIT PROVISIONS

**Temporary Total Disability Benefits:**  Benefits are payable for each Regular Season Game in which an Insured Player is unable to participate due to a Temporary Total Disability.  This includes any Regular Season Game which is suspended or canceled, if the Club continues the Insured Player's Covered Salary.  Benefits are subject to:

1.    Satisfaction of the Elimination Period by such Insured Player;
2.    Definitions, limitations, exclusions and other terms of the Policy;
3.    The Club's continuation of the Insured Player's Salary pursuant to the terms of the Employment Contract; and
4.    The maximum Per Game Benefit and the Maximum Benefit Period.

An Insured Player must be under the regular care of the Physician who certifies in writing the Insured Player's Temporary Total Disability, unless regular care is not necessary due to the nature of such Temporary Total Disability.

Per Game Benefits are payable following the satisfaction of the Elimination Period in the amounts indicated on the Schedule and shall be limited to the lesser of:

a.    The maximum Per Game Benefit as indicated in the Policy;
b.    Eighty (80) percent of the Insured Player's per game Salary; or
c.    Seventy (70) percent of the Insured Player's per game Salary, if the Insured Player is the designated beneficiary.

The per game Salary for any Policy Year shall equal the Covered Salary for that Policy Year divided by the number of Regular Season Games in that Policy Year.  Any increase or decrease in Salary during the Policy Year must be approved by Us for determining the per game Covered Salary.  We also reserve the right to decrease the amount of the per game Salary with retroactive effect to coincide with changes to the Employment Contract should a Club decrease an Insured Player's Salary for any Policy Year and not seek Our approval in determining the new per game Covered Salary.

Benefits are payable for Temporary Total Disability resulting from activities specifically excluded by the Employment Contract, for so long as the Club continues the Insured Player's Salary during the Period of Disability.  No benefits shall be paid after the end of the Maximum Benefit Period.

Benefits are payable to the Club unless otherwise assigned by Club or another beneficiary is designated on the Schedule.

**Elimination Period:** The Elimination Period must be satisfied within 164 consecutive Regular Season Games and does not include any Regular Season Game which is suspended or canceled, unless the Club continues the Insured Player's Salary.  A separate Elimination Period must be met for each Period of Disability.

G446-23                                                                6

**Recurrent Disability:** If after a Period of Disability, the Insured Player is released by the Physician to return to full-time play for at least 41 Regular Season Games, any subsequent disability will be considered a new Period of Disability and subject to a new Elimination Period.

If after release by the Physician, the Insured Player does not return to full-time play for at least 41 Regular Season Games, any subsequent disability will be considered part of a prior Period of Disability and not subject to a new Elimination Period; unless, the subsequent disability is the result of:

a.    An Injury to a different part of the Insured Player's body; or
b.    A Sickness due to a cause entirely different from the cause of the prior Period of Disability;

then the subsequent disability will be considered a new Period of Disability and subject to a new Elimination Period.

**Concurrent Disability:** Concurrent periods of Temporary Total Disability that are due to Injuries or Sicknesses that result from unrelated causes shall constitute separate Periods of Disability subject to separate Elimination Periods.

The regular season Per Game Benefit shall be paid only once for each Regular Season Game for which benefits are payable, regardless of the number of causes of Temporary Total Disability.

**Rehabilitation Benefits:** Club may request a period of rehabilitation after a Period of Disability for which benefits have been paid. A Physician must release the Insured Player from Temporary Total Disability to return to the duties of a professional basketball player in the NBA.

Rehabilitation benefits are payable at Our sole discretion. If approved, benefits may be continued for only the first six (6) consecutive Regular Season Games following the Physician's release of the Insured Player from Temporary Total Disability. The Insured Player must record no more than eight (8) minutes of official playing time in each Regular Season Game during rehabilitation.

Rehabilitation benefits and participation limits shall be determined independently for each game. Rehabilitation benefits shall be paid only once for the same disability in the same Policy Year.

**Benefit Commutation:**  Temporary Total Disability benefits may be commuted to a present value lump sum if:

a.   The Insured Player is Presumptively Disabled; or
b.   A Physician has certified that the Insured Player is otherwise permanently disabled and will never again be able to perform the duties of a professional basketball player in the NBA.

Commuted benefits, if approved by Us, shall be paid as full settlement of any remaining benefits.  The present value discount factor shall be agreed upon by Club and Us. Future regular care by a Physician is not required upon payment of approved commuted benefits.

**Salary Commutation:**  A Temporarily Totally Disabled Insured Player's Salary may be commuted to a present value lump sum by a Club.  Benefits shall continue to be payable as if the Salary had not been commuted.  The Club shall be considered as obligated to continue the Insured Player's Salary for the remainder of the Period of Disability.

## EXCLUSIONS, LIMITATIONS and TERMINATION

**Exclusions:**  No benefits are payable for any Insured Player's Temporary Total Disability caused by, resulting from or in connection with:

1.   Participation by the Insured Player in any activity excluded in the Employment Contract, unless the Club continues to pay the Insured Player's Salary.

2.   Any condition or activity specifically excluded from coverage by endorsement or rider.

3.   Commission of a criminal act which results in the Insured Player's conviction of an offense which is punishable by imprisonment for more than one year.  This shall not include any conviction or offense arising from the operation of a motor vehicle.

4.   The Insured Player being under the influence of any drug or narcotic which is not lawfully available, unless administered as prescribed or advised by a Physician for a medical condition other than drug addiction.

5.   Self-destruction or attempted self-destruction or intentional self-inflicted Injury or Sickness, by the Insured Player while sane.

**Limitations:** Except for benefits accumulated as due but unpaid, no benefits will be paid or continued:

1.   On or after the date the Insured Player dies;

2.   On or after the date the Insured Player is released by a Physician to return to play professional basketball in the NBA, except for approved rehabilitation benefits or in accordance with the Recurrent Disability provision herein;

3.   During any Elimination Period; or

4.   For any Injury or Sickness first occurring or manifesting after termination of coverage with Us, subject to the termination provision of the Policy.

Termination: Coverage for any Insured Player will end on the earliest of:

1.   The date the Policy is terminated, subject to any elected runoff period.

2.   The end of the Coverage Period.

3.   The termination of the Employment Contract between the Club and the Insured Player. Such termination shall not apply if:

    a.   A successor Employment Contract is concurrently executed and accepted by Us; or

    b.   The Insured Player is traded to another Club. Coverage, to the extent provided on the date of the trade, shall be transferred to the new Club.

4.   The date the Certificate is canceled by the Club.

Termination of coverage shall not affect any benefit which accrued while coverage was in effect.

## CLAIM PROVISIONS

**Notice of Injury or Sickness:** Written notice of any Injury to or Sickness of an Insured Player must be provided to Us within 20 calendar days of such Injury or Sickness being reasonably expected to result in a claim for benefits. A claim for benefits will not be denied or reduced if notice is given after such time period but as soon as is reasonably possible.

**Notice of Claim; Claim Forms; Proof of Disability:** When the notice of Injury or Sickness is received, forms for filing a proof of disability will be sent to the Club. If these forms are not sent within 15 days, the proof of disability requirement will be considered met by giving Us a written statement of the nature and extent of the Injury or Sickness within the proof of disability time limit.

Written proof of disability must be completed and returned to Us within 90 days of a Temporary Total Disability or as soon thereafter as reasonably possible. Except for absence of legal capacity, no claim for benefits will be accepted after one year from the date of the Temporary Total Disability.

Written proof of disability shall include medical reports, Physician's statements, operative reports and any other supporting documentation related to the diagnosis and treatment of the Injury or Sickness as determined by Us.

Subsequent proof of disability, as determined to be satisfactory by Us, shall be required on no less than a monthly basis while an Insured Player is Temporarily Totally Disabled and receiving benefits. We will determine, based on the nature of the Temporary Total Disability, when subsequent proof of disability is no longer necessary.

**Payment of Claims; Assignment:** Benefits will be paid no later than 60 days following the end of a month of Temporary Total Disability for which benefits are payable and all required proof of disability has been received. Benefits shall be paid to the Club unless otherwise assigned to the Insured Player or other beneficiary. Any assignment of benefits must be in writing and approved by Us prior to the date of payment. Payment of benefits will discharge Us from all liability to Policyholder, the NBA, the Club, Insured Player or any assignee or other beneficiary. Benefits, to the extent permitted by law, shall be exempt from attachment or claims of creditors of Policyholder, the NBA or the Club.

**Application Statements:** All statements made in any application, in the absence of fraud, shall be deemed representations and not warranties. No statement made in any application or knowledge by any Club or Player shall be imputed to any other Club or Player. No statement will be used to contest the validity of any Insured Player's coverage or reduce benefits unless: (a) it is in writing and signed by Policyholder, the NBA, any Club or Player; and (b) a copy is furnished to Policyholder, the NBA or Club.

After an Insured Player's coverage has been in effect for two (2) years, during the lifetime of that person, only fraudulent misstatements in an application may be used to void coverage or deny any claim. Any increase in coverage will begin a new two (2) year contestable period for such increase.

**Payment Error:** Any benefit paid in error may be recovered from the Club or designated beneficiary receiving the incorrect payment. At Our option, We may offset the overpayment against future benefit payments due the Club having received, or whose designated beneficiary received, such benefits. The acceptance of Premium or paying other benefits shall not constitute a waiver of Our rights under this section. Recovery or offset shall be in addition to any other remedies available to Us at law or in equity.

**Fraudulent Claim Submission:** If any Club or Insured Player knowingly submits or participates in the submission of a claim for benefits which contains false or misleading information that would have the effect of: (a) increasing the benefit payable; or (b) paying a benefit not otherwise payable, We shall have the right to rescind that Insured Player's coverage to the date the fraud was perpetrated. Such rescission is without prejudice to any other right or remedy available to Us at law or in equity.

**Medical Records and Examination:** With written authorization, We may obtain an Insured Player's medical records. We have the right, at Our expense, to have an Insured Player examined as often as reasonably necessary while a claim on that Insured Player is pending or during the course of a claim.

**Claim Appeal:** If any claim for benefits is denied, in whole or in part, Club shall be notified in writing. Such denial shall include:

a.  The specific reason for the denial;
b.  The Policy provision upon which the denial is made; and
c.  An explanation of the claim appeals process; or
d.  Any additional information or documentation which may be required to perfect a claim with an explanation of why it is needed.

The Club may request an appeal of a claim denial by submitting: (a) a written request for appeal within 180 days of receiving the claim denial; (b) any supporting documentation; and (c) any issues or comments, in writing. The Club may review any documents pertinent to the claim denial, subject to any privacy restrictions. A decision will be made by Us no later than 30 days after receipt of the appeal request and all supporting documentation, except in special circumstances a decision will be made by Us within 90 days of such receipt.

**Legal Actions:** No legal action for benefits may be brought against Us within 60 days after written proof of disability has been sent to Us. No such action may be brought more than three (3) years from the time written proof of disability is required to be given. All legal actions, whatever the nature, are subject to: (a) full compliance with all terms, exclusions, limitations and conditions of the Policy as a condition precedent; and (b) arbitration.

**Arbitration:** Any dispute arising from the contract between the Policyholder, the NBA or any Club on one hand and BWD or Us on the other hand, shall be submitted to binding arbitration. The Commercial Arbitration Rules of the American Arbitration Association shall apply, except with respect to selection of the arbitration panel and location.

Each party to the arbitration shall select one arbitrator. A third independent arbitrator shall be selected by the first two arbitrators. Arbitration shall be held in a location agreed to by the parties. If no location can be agreed upon, arbitration shall be held at the then

current main corporate office of the American Arbitration Association. If the American Arbitration Association is not in existence or its offices unavailable, arbitration shall be held at Our home office.

The costs of arbitration shall be borne equally by all of the parties thereto.



**INSURANCE COMPANY**

**Endorsement No. 1**

Attaching to and forming part of Policy No. NBA01/Certificate No. 1001-1664

Issued to:     **Philadelphia 76ers**
              **Todd MacCulloch**

It is hereby noted and agreed that

with effect from 12:01 a.m. September 1, 2002, the Contribution Installments due under the above Certificate are amended as follows:

| For Policy Year Beginning: | Covered Salary: | Contribution: | Due Date: |
|---|---|---|---|
| September 1, 2002 | $4,991,800.00 | $262,069.50 | September 1, 2002 |
| September 1, 2003 | $5,445,600.00 | $326,736.00 | September 1, 2003 |
| September 1, 2004 | $5,899,400.00 | $353,964.00 | September 1, 2004 |
| September 1, 2005 | $6,353,200.00 | $381,192.00 | September 1, 2005 |
| September 1, 2006 | $6,807,000.00 | $122,526.00* | September 1, 2006 |

* The Contribution for the final season of coverage reflects a 70% discount, which will not apply if coverage is canceled or a claim is paid or pending in the final season, or if coverage is extended to include future seasons.

Covered Salary, Per Game Benefit and Contribution amounts are subject to adjustment pursuant to the terms and conditions of the Policy.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED**

Additional Contribution:   NIL

Contribution Credit:       NIL

Effective Date:            September 1, 2002

Date of Issue:             May 4, 2004

(516) 327-2700
(516) 327-2800 FAX

**BWD Group LLC**
A Multiple Series Limited Liability Company                 Insurance

BWD Plaza, P.O. Box 9056, Jericho, New York 11753-8950

Trustmark Insurance Company

By: _____
        Corporate Secretary

# EXHIBIT C

PA Insurance Department: Search Results                                    Page 1 of 1

## PENNSYLVANIA **INSURANCE DEPARTM**


Advanced Search

- Administrative Hearings
- Brochures
- adultBasic
- CHIP
- Company Information
- Consumer Information
- Continuing Care (CCRC)
- The Department
- Enforcement Actions
- Links
- Producer Services
- Liquidations, Rehabilitations, Special Funds
- USTIF
- Download Assistance
- Home

Login    Register

### TRUSTMARK INSURANCE COMPANY

**NAIC:** 61425

**Home Address**
400 FIELD DRIVE
LAKE FOREST, IL 600452581

**Mailing Address**
400 FIELD DRIVE
LAKE FOREST, IL 600452581

**Domicile:** IL

**Ph:** 847-615-1500

**Type:** Life

**URL:** www.trustmarkins.com

**Powers:**
Accident and Health, Life and Annuities

Consumer Information

Go Back to Previous Page

Company information is current as of: 11/24/2004

Home | Site Map

Visit the
**PAPowerPort**

Copyright © 2003 Commonwealth of Pennsylvania. All Rights Reserved.
Commonwealth of PA Privacy Statement

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PHILADELPHIA 76ERS L.P., | : | Civil Action No. 04-CV-4972 |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| TRUSTMARK INSURANCE COMPANY, and | : |  |
| NEW JERSEY NETS BASKETBALL LLC, | : |  |
|  | : |  |
| Defendants. | : |  |

## <u>ORDER</u>

AND NOW, this        day of December, 2004, upon consideration of the Motion of Defendant Trustmark Insurance Company's Motion to Dismiss or Transfer Venue and Motion for an Emergency Stay of Plaintiff's Pending Motion to Compel Arbitration and Plaintiff's response thereto,  it is hereby ORDERED that the Motions are DENIED.

_____

Hon. Edmond V. Ludwig, USDJ

## CERTIFICATE OF SERVICE

I , Robert W. Hayes, certify that, on this date, I caused a true and correct copy of the foregoing MEMORANDUM OF LAW OF PLAINTIFF PHILADELPHIA 76ERS L.P. IN OPPOSITION TO DEFENDANT TRUSTMARK INSURANCE COMPANY'S MOTION TO DISMISS OR TRANSFER VENUE AND MOTION FOR AN EMERGENCY STAY OF PLAINTIFF'S PENDING MOTION TO COMPEL ARBITRATION by Federal Express upon:

> Jeffrey A Rosenthal, Esquire
> Cleary, Gottlieb, Steen & Hamilton
> One Liberty Plaza
> New York, NY 10006

via facsimile and first class mail upon:

> Robert J. Kheel, Esquire
> Wilkie Farr & Gallagher, LLP
> 787 Seventh Avenue
> New York, NY 10019

and via hand delivery upon:

> Stephen C. Baker, Esquire
> Drinker Biddle & Reath, LLP
> One Logan Square
> 18th & Cherry Streets
> Philadelphia, PA 19103

Dated:  December 6, 2004

_____
Robert W. Hayes